Filed 3/14/16  P. v. Sturdivant CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KELLEY J. STURDIVANT,<br><br>Defendant and Appellant. | B263430<br><br>(Los Angeles County<br>Super. Ct. No. SA084567) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie E. Brown, Judge.  Affirmed as modified.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and Connie H. Kan, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

The jury found defendant and appellant Kelley J. Sturdivant guilty of one count of pimping. (Pen. Code, § 266h, subd. (a).)[1] The trial court sentenced defendant to a total of four years in state prison, consisting of the low term of three years on the pimping conviction, plus one year for a prior prison term pursuant to section 667.5, subdivision (b).[2]

Defendant raises the following issues on appeal: the evidence is insufficient to support his conviction; evidence of his prior arrest was improperly admitted; the trial court committed instructional error, placed an improper limitation on cross-examination, and admitted improper expert testimony; there was prosecutorial misconduct; and his sentence was enhanced by one year based on a prior prison term (§ 667.5, subd. (b)) that was neither pled or proved. The Attorney General concedes, and we agree, that the trial court erred in imposing the enhancement under section 667.5, subdivision (b). In all other respects, the judgment is affirmed.

**FACTS**

*Prosecution*

**Reanna Douglas**

Reanna Douglas contacted defendant in response to an online advertisement seeking "available dancers." They met in person a few days later. Defendant told her she was really pretty and "fit a description." He said she could make "hundreds of dollars" for dancing. Defendant did not discuss whether he would be paid for Douglas's work. He told her to give him a call if she was interested. Douglas called defendant that week,

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

[2] The information did not allege that defendant served the prior prison term, nor was it admitted by defendant or proven at trial. Other recidivism allegations that were alleged were ultimately not part of the sentence imposed.

and went to his apartment. He told her about "certain things that [she] could be doing" such as "massaging, and meeting with different people, and how different people have different desires, and how [she] should be able to make that happen, and how [she] should be comfortable with doing that."

Defendant showed Douglas several ads on a website called "Backpage," with girls in bras and underwear or shorts that said things such as: "To have a good time, call this number, or if you want to, like, have fun." Defendant said Douglas "fit the pictures of certain girls," and "fit the type" of being "Latin and busty, small." He showed her how to massage him. She massaged defendant's penis as well as his back and legs. He told her how "guys would like it," and even if she did not "like doing it," to "pretend like [she] liked it." He told her to "not really kiss," but showed her "certain ways to kiss and massage." They had oral sex and intercourse. Defendant explained that pricing varied depending on the services requested. If Douglas spent about an hour with the client, she would earn approximately $150 or $200. She would earn more if she stayed longer. Defendant told her that "everything was the same unless it was, like, a weird fetish," such as "feet fetish" or "anal," which would cost more. He asked her if she would do "that stuff," she said no because she "didn't like that stuff," and never did it. He asked if she "knew what to do," and said that if she had "more experience . . . the guys would like [her] more."

Douglas went to one client's house for a "job," and they just talked without having sex. She gave defendant the money paid by the client, and defendant returned half of it back to her. Defendant had instructed her to give him all of the money she made, and he would "split" it with her. Sometimes defendant would have "everything ready," and other times, he was "rushed" and she would have to pay for the hotel rooms where she serviced clients. Douglas worked for defendant several times every other week, for approximately one year. He usually picked her up for a job, but sometimes she drove to a motel to meet him. Defendant always went to the location where she was working. He booked rooms and posted advertisements on Backpage and another website. Douglas never placed ads herself. She did not know where defendant went while she was with

3

clients, but he told her that he would be close by just in case anything happened. Defendant gave her a cell phone whenever they worked together. She was supposed to text him if there was any trouble. Douglas did not feel like she worked for defendant, but he did "a lot of . . . everything, and [they] split everything." He drove her everywhere, posted ads, booked the motel rooms most of the time, watched out for her, and made sure no one hurt her. He told her to use a condom "no matter what," and always carried condoms for her use.

Douglas was arrested for soliciting for prostitution at some point in 2013. On June 13, 2013, she was arrested a second time. She was at the Lincoln Inn Motel after 2:00 p.m. on that day. Defendant booked a room for her and stocked the nightstand with condoms. Douglas waited in the room until a man arrived. The man said he had about $120, and she told him that he could stay for 30 minutes. He asked her for a "blow job," and she responded, "Whatever you want." She told him to put a condom on, and he excused himself to the restroom. Douglas put away the money the man had given her. She was checking a text message when two or three police officers entered the room and arrested her. The officers asked if there was a "guy" with her. She said yes and provided defendant's name.

Douglas was released from police custody. A few days later, defendant sent her a text message that read, "Hey, Reanna, it's James. Hello yo." She responded, "Yo, what's up? Just got my phone back." He texted her his phone number, and asked her to call him so that they could "compare notes and do damage control."

On the day she appeared in court, Douglas saw defendant outside of the courthouse as she was leaving. He told her not to say anything, to just keep doing what she was doing, and to deny everything.

Douglas met two girls who worked with defendant. She met the first girl at a hotel. The other girl named Carla escorted with defendant. Carla used the same phone Douglas used when she worked for defendant. Douglas used four different names when she worked with defendant, including Alicia.

4

Douglas was charged with prostitution (§ 647, subd. (b)), and escorting without a permit (Los Angeles Mun. Code, § 103.107.1, subd. (b)). On October 21, 2013, she entered a plea of guilty to escorting without a permit, and the prostitution charge was dismissed.

**Officer Testimony**

On June 13, 2013, Los Angeles Police Department Officer Ryan Quiroga responded to an advertisement on Backpage as part of an undercover sting operation. The ad read, "Sexy Alicia, available 24. Hey guys. I'm Alicia. I'm available to fulfill all your desires. I'm real. I don't play games. Pick up the phone and call me, Alicia. Number is (310) 703-9295. Text friendly. No vulgar language, please. Poster Age is 24. Location, Los Angeles, Venice. In call, out call." Officer Quiroga called the number, and Douglas answered. He asked her if she was available to meet, and she said she was immediately available. Douglas told Officer Quiroga to call her when he got into the area.

When he got close, Officer Quiroga called again. Douglas told him to park in a McDonald's parking lot, and to call her when he arrived. When he called again, she asked for the make, model, color, and location of his car. Officer Quiroga saw defendant walking around the parking lot, looking at all the cars, and checking his cell phone. The officer believed defendant was a "look out" for Douglas. Douglas gave Officer Quiroga her room number in the Lincoln Inn Motel.

When Officer Quiroga arrived at the room, he told Douglas he had $180. She said she charged $160 for 30 minutes. He told her she could keep the $180, and asked her "what she was good at." She said she was good at everything. He asked her if they could start with oral copulation, and she responded, "Of course." Douglas told Officer Quiroga he had to wear a condom, and gave him one from the drawer of the nightstand. Officer Quiroga requested "doggy style" sex, and Douglas agreed to do it. Officer Quiroga went

5

into the bathroom and notified his partners that Douglas had committed a prostitution violation. The officers arrived, and took Douglas into custody.

Officer Quiroga had responded to Backpage ads over a hundred times. He had never seen an advertisement that was not for prostitution services.

Sergeant Luqman Watkins, a vice investigator, testified that he arrived in the parking lot about two minutes after Officer Quiroga in an unmarked vehicle. Three other officers were present. Sergeant Watkins saw defendant get out of a burgundy-colored Monte Carlo and walk toward the McDonald's. Defendant was using a cell phone and looking around. At first defendant appeared to be going to the entrance of the McDonald's, but then he turned around, walked back to his car, and sat down. Officer Quiroga went into the Lincoln Inn Motel, and Sergeant Watkins followed.

Sergeant Watkins obtained copies of folios, or "registration slips," from the Lincoln Inn Motel manager, showing that defendant had rented a room at the hotel six other times. Based on his background, training, and experience, Sergeant Watkins believed defendant was acting as a "look out," and "potentially" as a pimp. Douglas told Sergeant Watkins that she was working for defendant. Escorts working within the city of Los Angeles have to be licensed by the state. Neither Douglas nor defendant had a license. The officers arrested defendant.

Sergeant Watkins testified that Backpage was known as a prostitution website, and was "pretty much the hub of internet prostitution."


**Other Evidence**


Officer Joseph Cameron testified regarding defendant's prior uncharged arrest for pimping in El Segundo in 2012.

6

*Defense*

Defendant testified that he was working as an independent driver at the time of his arrest, as he had done for 12 years. He started driving in 2003, and worked six or seven years for Universal Referral and Metro Entertainment. After that he began working independently. He was still employed as a driver at the time of trial. He advertised his driving services in the "Gig" section of the Backpage website.

Defendant initially met Douglas in 2010 through a friend, Carla Palacio. Palacio was a dancer and escort, and he was her driver. Defendant met Douglas a second time in 2012, when she responded to an ad he posted for his driving services. He did not know Douglas was prostituting at the time of his arrest. He specifically warned Douglas not to engage in prostitution, because he was concerned that if she was arrested for prostitution, he would get arrested for pimping. On one occasion defendant had stopped driving for a dancer after he discovered she was performing illegal sexual services for her customers. He believed Douglas only danced, modeled, or modeled nude. Defendant provided security, in addition to driving. Security is needed because many of the clients think they are getting sex, and when they find out they are not, some get angry and want their money back. Defendant would often stand outside the door to protect the women.

Defendant sometimes rented motel rooms for dancers. He rented a room for Douglas on the day of the arrest, because she did not have her identification with her.

Defendant had been working as a driver on the day of his prior arrest in 2012. The woman he was working for wanted him to "hang out" in a parking lot while she went to an appointment. He got out of his car to urinate and was arrested. He did not face charges in conjunction with that arrest.

Defendant was convicted of felony robbery in 1994.

**DISCUSSION**

*Sufficiency of the Evidence*

Defendant contends his conviction for pimping must be reversed because insufficient evidence supports the jury's finding that Douglas was a prostitute, which is an essential element of the crime. This argument lacks merit.

In determining whether sufficient evidence supports a conviction, "we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] . . . 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, italics omitted.) The "testimony of a single witness is sufficient to support a conviction" unless it is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"].)

Under section 266h, defendant's conviction for pimping required the jury to find that defendant (1) knew Douglas was a prostitute, and (2) asked for payment or received payment for soliciting prostitution customers for Douglas. The jury was instructed pursuant to CALCRIM No. 1150, which defined a prostitute as "a person who engages in

8

sexual intercourse or any lewd act with another person in exchange for money.  A lewd act means physical contact of the genitals, buttocks, or female breast of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification."  Prostitution also occurs when a person has the specific intent to engage in either sexual intercourse or lewd acts in exchange for money and takes some step in furtherance of that act (*People v. Dell* (1991) 232 Cal.App.3d 248, 264), but the jury was not so instructed.

Defendant argues the jury's finding that Douglas was a prostitute had to be based on her actions rather than on her intent because the jury was not instructed on intent.  He asserts Douglas never specifically stated that she engaged in acts that would constitute prostitution, and in the absence of her testimony regarding specific acts, the evidence is not sufficient to support the finding that she was a prostitute.  The record demonstrates otherwise.

Douglas testified that she met other girls who worked for or with defendant, and that she was "pretty sure they were doing what [she] was doing."  When she was specifically asked what type of work one of these girls was doing, she testified that she believed the girl was "escorting."  The prosecutor later sought clarification of the term:

"[Prosecutor:]  You referred to—you said that you knew that the other girls were also escorting?

"[Douglas:]  Yes.

"[Prosecutor:]  Is that—what is escorting, as you call it?

"[Douglas:]  I just don't like the word prostitution, but it's basically that.

"[Prosecutor:]  Sex for money?

"[Douglas:]  Yes."

It is reasonable to infer from Douglas's testimony that she considered herself to have been a prostitute, providing sex for money.  Defendant urges that the term "sex," as Douglas used it, encompasses acts other than sexual intercourse or lewd acts as defined by statute.  He speculates that Douglas may have solely engaged in these other activities, and that she was referring to acts that would not constitute prostitution under the legal

9

definition when she testified that she and the other girls traded sex for money. From this premise, defendant argues he could not have engaged in pimping.

We are not persuaded. In the common understanding, "sex" consists of sexual intercourse and lewd acts. Even if we were to accept the premise that Douglas's testimony was not conclusive on the matter, the circumstantial evidence that Douglas was a prostitute was overwhelming. Douglas's services were advertised on "Backpage," which Sergeant Watkins identified as the "hub" for prostitution ads. Douglas testified that she had sexual intercourse with defendant and engaged in lewd acts with him for the specific purpose of learning how to service her clients. Douglas agreed to engage in both sexual intercourse and a lewd act with an undercover officer, she told the officer how much her services would cost, and she accepted money from him to perform the acts. She told the officer he had to wear a condom. Douglas also testified that she had so many clients she could not enumerate them. Substantial evidence supports the jury's finding that Douglas was a prostitute, and defendant's conviction for pimping.

### *Prior Uncharged Arrest Evidence*

Defendant contends that the trial court erred in admitting evidence of a prior uncharged arrest for pimping, as it was only relevant to prove that defendant had the disposition to commit the offense. He attacks the admission of evidence of his prior arrest on several grounds: (1) the prior arrest lacked probative value because he was not prosecuted or convicted; (2) the prior arrest was inadmissible for purposes of establishing intent, motive, knowledge, or plan or scheme to commit the offense; (3) the prosecutor deceived the trial court into admitting the evidence to establish intent and motive, when it was her intent to argue knowledge and plan or scheme to the jury; and (4) evidence of the prior uncharged arrest was not substantial under Evidence Code section 352. Defendant further argues that introduction of the prior arrest evidence was prejudicial. We conclude the evidence was properly admitted to prove intent, motive, knowledge, and common plan, and was not substantially more prejudicial than probative.

10

**Law**

As a general proposition, evidence of an uncharged criminal act is admissible to prove facts other than disposition to commit a crime, including, but not limited to "motive, opportunity, intent, preparation, plan, knowledge, identity, [and] absence of mistake or accident." (Evid. Code, § 1101, subd. (b).) The court may exclude such evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The connection of the evidence of prior crimes with the crime charged must be clearly perceived, and it has sufficient probative value only when it "'"[tends] logically, naturally, and by reasonable inference, to establish any fact material for the [P]eople, or to overcome any material matter sought to be proved by the defense."' [Citation.]" (*People v. Haston* (1968) 69 Cal.2d 233, 247.) The court's decision to admit evidence of uncharged crimes is reviewed for abuse of discretion, and may be reversed when the ruling "'falls outside the bounds of reason.'" (*People v. Kipp* (1998) 18 Cal.4th 349, 371, quoting *People v. De Santis* (1992) 2 Cal.4th 1198, 1226.)

Circumstances considered by the court in deciding whether to admit evidence of uncharged crimes include similarity of the conduct, whether the evidence for the charged and uncharged conduct comes from independent sources, and whether the jury would be likely to convict based on the uncharged conduct because that conduct did not result in a criminal conviction. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404-405 (*Ewoldt*).) The last circumstance is amplified if the evidence of the uncharged acts is stronger or more inflammatory than the evidence regarding the charged offenses, because that would increase the danger that the jury would be inclined to punish the defendant for the uncharged acts. (*Id*. at p. 405.) Where an issue is not reasonably subject to dispute the prejudicial effect of such evidence would outweigh its probative value, because the evidence would be cumulative. (*Id*. at pp. 405-406.)

11

**Proceedings**

Prior to trial, defendant filed a motion in limine to exclude evidence of his prior uncharged arrest for pimping in El Segundo in 2012 as untimely and inadmissible under Evidence Code section 352. The People sought admission of the facts of the prior arrest under Evidence Code section 1101, subdivision (b), for the purposes of establishing intent, knowledge, and defendant's "M.O." The prosecutor argued, "It was a similar type of situation. [¶] So I think it's extraordinarily relevant in this case to show that he was acting as a pimp, and knew what was going on in those motel rooms . . . ." Defense counsel responded that because the case involved different parties, different officers, and had not been litigated, the questions regarding defendant's knowledge, motive, and intent would not shed light on the instant case. The court responded, "If that were the test of [Evidence Code section] 1101 [subdivision] (b), you would never have it. [Evidence Code section] 1101 [subdivision] (b) doesn't require charges be filed, doesn't require a former case, or any of that. It just requires that it have the key material and probative value in the case currently before the court. [¶] So the argument[s] you make in that regard aren't applicable to this." After discussing and disposing of the timeliness issue, the court ruled on relevance: "[G]iven this court's knowledge of the charges in this case . . . I believe [the prior uncharged arrest evidence] is material, and now it's under [Evidence Code section] 1101 [subdivision] (b) as far as [Evidence Code section] 352, balancing any [Evidence Code section] 1101 [subdivision] (b) evidence by its very nature is going to be damaging to the defense, I understand that. But I think that's well settled that that premise is always going to exist when [Evidence Code section] 1101 [subdivision] (b) evidence is proffered by the People. [¶] In this particular instance, I don't think that the probative value is outweighed by the prejudice. I think that I've looked at the jury instructions that have been submitted to this point in time, the drafts, and there is the one that pertains to the limiting instruction, and limited use for [Evidence Code section] 1101 evidence, and I do believe that that would be entirely appropriate in this case, and would be given by the court, and I believe on that basis, that the [Evidence

12

Code section] 1101 [subdivision] (b) evidence is admissible in this case, and will be admitted. [¶] That's the ruling." The court later added, "Let me make one clarification, that it will be admitted for the issues of intent and motive only, not on the prior knowledge."

City of El Segundo Police Officer Joseph Cameron testified regarding defendant's prior uncharged arrest for pimping. Officer Cameron participated in a prostitution sting operation on February 17, 2012. The officers were looking for a Hispanic female who had advertised on a website. Officer Cameron had a photo of the woman from the website, and knew to expect her at the Courtyard Marriott at around 8:00 p.m. He observed two cars entering a parking lot adjacent to the Marriott at the same time. One was a maroon Monte Carlo, which defendant was driving. Nancy Ramirez, who was suspected of prostitution, was driving the other car. Defendant and Ramirez parked next to each other. Defendant got out of his vehicle, walked over to the driver's side of Ramirez's vehicle, and had a conversation with her. He then walked around the entire perimeter of the Marriott. Defendant returned to Ramirez's car. Ramirez got out, handed him her purse, and went into the Marriott. Defendant took the purse back to his car and sat down in the driver's seat. Soon afterwards, Officer Cameron was informed that Ramirez had been arrested for prostitution. He and two other officers approached defendant's car and asked him what he was doing there. He said he was waiting for a friend named Nancy. The officers observed a purse in the back seat, which was later identified as Ramirez's. They arrested defendant for pimping in violation of section 266h.

In a hearing to discuss the jury instructions after the close of evidence, the prosecution raised the issue of the purposes for which the prior arrest evidence could be used, as stated in CALCRIM No. 375:

"[Prosecutor]: In regards to [CALCRIM No.] 375 . . . your honor had said it was only for, I believe you had said that it was for intent or motive. [¶] I did not take [knowledge or common plan] out because I thought [they] applied. So I want to make sure there's not an objection, intent, knowledge, or common plan because I think that it

13

does show his knowledge as to what they were doing as well as common plan of him waiting outside, him perusing, or walking around the parking lot looking for police. [¶] So I thought those applied, which is why I let them in. That was not originally what your honor had said was going to be a part of it. So I wanted to make sure if there is an objection or not. It is clear.

"The Court: Defense.

"[Defense Counsel]: For the record, I'm going to object to the inclusion of the phrases knowledge and common plan.

"The Court: The objection is noted. I think that based on the evidence, the state of the evidence now that the record is closed, that would be supported, given the fact that it came out regarding the defendant's previous conduct. [¶] So I note the objection and it's overruled. And I will give [CALCRIM No. 375] in its current form on all grounds, intent, motive, knowledge, and common plan."

The trial court instructed the jury under CALCRIM No. 375 that:

"The People have presented evidence that the defendant committed another offense of violation of Penal Code section 266h, pimping, that was not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense or act. Proof by a preponderance of the evidence is different from -- is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged act or offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether the defendant acted with the intent to make money and solicit Reanna Douglas for prostitution in this case, or the defendant had a motive to commit the offense alleged in this case, or the defendant knew Reanna Douglas was working as a prostitute when he illegally acted in this case, or the defendant had a plan or scheme to commit the offense alleged in this case. [¶] In evaluating this evidence consider the similarity or

14

lack of similarity between the uncharged offense and act, and the charged offense. Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant had a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offense or act, this conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove the defendant is guilty of pimping. The People must still prove the charge beyond a reasonable doubt."

### Discussion

Defendant's argument that his prior arrest had no probative value because he was not charged or prosecuted lacks merit. As the trial court noted, Evidence Code section 1101, subdivision (b) does not require that an arrest be charged or prosecuted to be admitted. "The conduct admitted under Evidence Code section 1101 [subdivision] (b) need not have been prosecuted as a crime, nor is a conviction required. (See, e.g., *People v. Garcia* (1995) 41 Cal.App.4th 1832, 1849, disapproved on another ground in *People v. Sanchez* (2001) 24 Cal.4th 983, 991, fn. 3.)" (*People v. Leon* (2015) 61 Cal.4th 569, 597.)

Here, in both instances, an ad for the services of a Hispanic woman had been placed online. Defendant parked in a lot adjacent to the hotel where the woman had arranged to meet with a client. He surveyed the area around the hotel, and then waited in his car for the woman to return. The women were both arrested for prostitution. The common features of the incidents "were sufficiently similar to the charged crimes to show that defendant acted with both the same intent and a common plan." (*People v. Leon*, *supra*, 61 Cal.4th at p. 598.)

Defendant attacks the specific grounds for admission of the prior incident to prove intent, motive, knowledge, and common plan for reasons specific to each. However, these arguments were not presented to the trial court. When discussing intent and motive, defense counsel raised only the issue of whether the evidence was substantial and

15

probative in light of the fact that the conduct was uncharged and involved different parties, not whether it was relevant for the proposed purposes. Defense counsel objected to the inclusion of knowledge and common plan in CALCRIM No. 375, but did not state the basis for the objection in greater detail. Defendant has forfeited the challenges he raises on appeal by failing to object on the specific grounds below. (See *People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21 [defendant's failure to "make a timely and specific objection on the ground asserted on appeal" forfeits his appellate arguments based on the erroneous admission of the evidence].)

The contentions also fail on the merits, as the evidence was properly admissible to establish motive, intent, knowledge, and common plan. Defendant argues that his motive, if he was to be found guilty, is a straightforward desire for money that does not require additional proof to establish, and is cumulative because the issue is not subject to reasonable dispute. There are two categories of motive. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.) In cases such as this one, "'the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive*.' [Citation.]" (*Ibid.*) Here, the question was whether a crime had been committed. Evidence of the uncharged act helped to establish that defendant's actions were motivated by a desire to profit from prostitution, and not the actions of an innocent driver, as he claimed. Defendant denied any desire to profit from prostitution, instead arguing that he made sure to talk to the women he drove about avoiding illegal acts, and protected them when men who expected sex were denied it. On this point, the testimony was not cumulative, as the prior act tended "to overcome any material matter sought to be proved by the defense. . . ." (*People v. Deeney* (1983) 145 Cal.App.3d 647, 655.) Its admission to establish motive was not an abuse of discretion.

The evidence was also admissible to establish knowledge. Knowledge that Douglas was a prostitute was an essential element of the offense. Defendant strenuously argued that he did not know Douglas was prostituting herself. Evidence that he was in a very similar situation with another Hispanic woman who was arrested for prostitution

would tend to prove that he knew what Douglas was doing. The trial court did not abuse its discretion by admitting the evidence on this basis.

The evidence was likewise admissible to establish common scheme or plan. Common plan evidence is used to support an inference that criminal conduct occurred. (*Ewoldt*, *supra*, 7 Cal.4th at p. 393.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." (*Id*. at p. 403.) Although defendant's actions were not particularly unusual, they were highly similar in both instances, and tend to show defendant's common plan of obtaining personal financial benefit by prostituting women. The trial court could reasonably conclude that evidence of defendant's relationship with Ramirez supported an inference that he had a similar relationship with Douglas.

We disagree with defendant that evidence of his 2012 pimping activity was cumulative with respect to intent. Defendant portrayed himself at trial as an innocent participant in Douglas's activities. Defendant claimed that he was merely a driver who provided security for Douglas, and that he cautioned Douglas not to engage in prostitution. Evidence of defendant's 2012 pimping activity was admissible to rebut defendant's claim of innocent behavior regarding Douglas. (*People v. Scally* (2015) 243 Cal.App.4th 285, 292-293 [prosecution was entitled to introduce evidence under Evidence Code section 1101, subdivision (b), to rebut the defendant's claim of innocent activity "by showing that defendant is steeped in the pimping culture, thus undermining the claim that defendant was merely an innocent bystander"].) Proof of defendant's pimping conduct for Ramirez in 2012 tended to prove that defendant "was not a victim of his own ignorance, but was deliberately acting the part of the pimp" (*id.* at p. 293) in connection with Douglas's prostitution activity in 2013.

17

Defendant's suggestion that the prosecutor acted inappropriately by arguing to the jury that the prior act showed defendant's common plan and knowledge—although the trial court originally ruled the evidence admissible to prove intent and motive—is of no moment. The trial court agreed after argument that the prior act was admissible to also show common plan or scheme and knowledge, rulings which we uphold in this appeal. The prosecutor's argument provides no basis for a finding of error or prejudice.

Finally, admission of the uncharged act did not constitute an abuse of discretion under Evidence Code section 352. As discussed, the incidents were very similar. The evidence came from independent sources—Officer Watkins was the arresting officer in the instant case, whereas Officer Cameron arrested defendant in the prior uncharged incident. The evidence of the uncharged crime was not more inflammatory than the charged crime. There were fewer details of the uncharged arrest, and less evidence implicating defendant. In the case of the uncharged arrest, there was no mention of the details of the sting operation, or what type of sexual intercourse or lewd act was involved, in contrast to the more graphic description of the proposed sexual acts Douglas agreed to perform. Ramirez did not testify against defendant as Douglas had. The jury was not likely motivated to punish defendant for his prior arrest rather than the instant one. The trial court did not abuse its discretion.

***Instructional Error***

In a related argument, defendant contends that the court erroneously instructed the jury, because the evidence was not properly admitted for the purposes listed in CALCRIM No. 375 as given. Defendant also takes issue with language in CALCRIM No. 375 instructing the jury to take the similarity of the prior uncharged arrest and the charged crime into account, because it does not inform the jury of the necessary degree of similarity or how to weigh the evidence.

We review a claim of instructional error de novo. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759.) "An appellate court cannot set aside a judgment on the basis

18

of instructional error unless, after an examination of the entire record, the court concludes that the error has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.)" (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 642.)

As discussed above, the evidence was properly admitted for the purposes of establishing motive, intent, knowledge, and common plan. The jury was instructed on those limited purposes, and admonished that it could not consider the prior arrest to prove that defendant was a person of bad character or had a disposition to commit crime. We presume that it followed these instructions. (See *People v. Lewis* (2001) 26 Cal.4th 334, 390.)

Defendant has forfeited the issue of whether the instruction directing the jury to consider the similarity of the incidents was confusing, because trial counsel failed to request a clarifying or amplifying instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1211 [defendant's failure to request clarifying or amplifying instruction at trial forfeits any argument on appeal that instruction was ambiguous or incomplete].) The contention also fails on the merits. An instruction may be found to be ambiguous or misleading only if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Frye* (1998) 18 Cal.4th 894, 957.) "Although trial courts, generally, have a duty to define technical terms that have meanings peculiar to the law, there is no duty to clarify, amplify, or otherwise instruct on commonly understood words or terms used in statutes or jury instructions." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022.) We find nothing ambiguous in the language of CALCRIM No. 375, and note that defendant does not suggest with any specificity how the jury should have been instructed in order to make the instruction more clear.

### Limits on Cross-Examination

Defendant next contends that the trial court erred in preventing defense counsel from asking Officer Cameron if charges were ever filed against defendant in connection with his 2012 arrest. Defendant argues the testimony was highly relevant, and its

19

exclusion violated his constitutional rights to present a defense, cross-examine witnesses, and to assistance of counsel under the Sixth and Fourteenth Amendments. Alternately, he argues counsel provided ineffective assistance by failing to "fully develop" the issues by making an offer of proof after the prosecution's objection was sustained. Both arguments lack merit.

The entirety of defense counsel's cross-examination of Officer Cameron regarding defendant's prior arrest was as follows:

"[Defense counsel]: Okay. Now, charges were never filed in the district attorney's office against [defendant] based on that arrest, were there [sic]?

"[Prosecutor]: Objection. Relevance. Calls for speculation. Lack of foundation.

"The Court: Sustained.

"[Defense counsel]: I have nothing further."

As an initial matter, we note that when the trial court sustained the prosecution's objection, counsel did not object or make an offer of proof. A defendant who fails to assert claims of federal constitutional error in the trial court forfeits those claims on appeal. (*People v. Riccardi* (2012) 54 Cal.4th 758, 801 [confrontation clause claim]; *People v. Cua* (2011) 191 Cal.App.4th 582, 591 [due process claim] (*Cua*).) Nevertheless, we address defendant's arguments on the merits because he claims counsel provided constitutionally ineffective assistance by not raising them at trial. (See, e.g., *People v. Neely* (2009) 176 Cal.App.4th 787, 795 (*Neely*).)

"Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. [Citations.] A 'reasonable probability' is one that is enough to undermine confidence in the outcome. [Citations.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.) The Supreme Court has held that "[t]he performance component [of the analysis] need not be addressed first. 'If it is

20

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' (*Strickland v. Washington*, [*supra*,] 466 U.S.[ ] [at p.] 697.)" (*Smith v. Robbins* (2000) 528 U.S. 259, 286, fn. 14.)

We need only address the issue of prejudice in resolving defendant's claim of ineffective assistance of counsel. There was none. First, the trial court could reasonably conclude that whether defendant was charged in connection with the prior offense did not tend to prove or disprove an issue in dispute at trial. (Evid. Code, § 210.) Charging decisions are made by prosecutors for a variety of reasons; they are not made by arresting officers. Cases are rejected by prosecutors for filing for a myriad of reasons, and a decision to reject a case for filing does not reflect that the underlying conduct did not occur. The trial court did not abuse its discretion in sustaining a relevance objection.

In addition, defendant could not have suffered prejudice because he was permitted to testify that he was not charged. The prosecution did not contest defendant's testimony in this regard. CALCRIM No. 375 referred to the incident as "uncharged" several times, and made it clear that the jury must decide whether to believe that defendant committed the offense by a preponderance of the evidence. Defendant's ineffective assistance of counsel claim fails.

### *Expert Witness Testimony*

Defendant contends his constitutional rights to a fair trial and due process were violated when Sergeant Watkins testified that in the course of his investigation he came to believe that defendant was a pimp. Although trial counsel did not object to the testimony below, defendant argues that objecting would have been futile, and alternatively that counsel provided ineffective assistance. We conclude that even if the testimony was beyond the permissible scope, any error was harmless.

**<u>Proceedings</u>**

Sergeant Watkins testified as an expert on pimping and prostitution. He was the investigating officer in defendant's case, and also described the sequence of events that led to defendant's arrest.

On direct examination, the prosecutor asked Sergeant Watkins: "Based on your background, training, and experience, did you form an opinion as to what the defendant was doing in that location?" The sergeant responded that he had: "In my opinion, in that opinion—in that instance, I believe that he was there as a look out and potentially a pimp." Defense counsel did not object.

Defense counsel further explored the statement on cross-examination:

"[Defense counsel]: Now, going back to the state of mind at that moment you had a stronger suspicion that he was a look out than you had that he was a pimp, correct, yes or no?

"[Sergeant Watkins]: Ma'am, in this instance, and especially within prostitution, look out/pimp is synonymous. . . ."

Counsel further questioned the witness regarding the distinction between the terms "look out" and "pimp":

"[Defense counsel]: Now, if you were of the opinion at the time that you were answering [the prosecutor's] questions that look out and pimp were the same thing, then why did you say you suspected he was a look out, and then possibly a pimp? [¶] Why didn't you say something more like, 'I suspected he was a look out/pimp,' or 'a pimp/lookout?' [¶] Quite obviously you make the distinction, don't you?

"[Sergeant Watkins]: Well, the reason why I said it, I phrased it the way I did, I didn't have sufficient facts to say that he was a pimp at that point in time. [¶] Honestly, I just had reasonable suspicion to believe that he is involved in some kind of crime. I couldn't absolutely say that he was a pimp, and I couldn't have said that until after I spoke to the victim Reanna Douglas. [¶] Once I got that information I was able to form an opinion."

22

On redirect, the prosecutor broached the subject again:

"[Prosecutor]:  After you spoke to Reanna Douglas in the room, and she told you what she was doing, and what [defendant] who had rented the room for her did, at that point did you form the opinion that he was a pimp?

"[Sergeant Watkins]:  I formed an opinion that he was, yeah.  It was becoming more clear that he was deeply involved with her."

Defense counsel did not make an objection.

**Law**

"The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates.  [Citations.]  Such evidence is admissible even though it encompasses the ultimate issue in the case.  [Citations.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.)  "'"[A] witness may not express an opinion on a defendant's guilt.  [Citations.]  The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue.  [Citations.]  'Rather, opinions on guilt or innocence are inadmissible because . . . the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.'"'  [Citations.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)  We review the trial court's decision to admit expert testimony for abuse of discretion.  (*People v. Leonard* (2014) 228 Cal.App.4th 465, 493 (*Leonard*).)

**Discussion**

We agree with the Attorney General that defendant forfeited any challenge to Sergeant Watkins's testimony by failing to object below.  (See *Cua*, *supra*, 191

23

Cal.App.4th at p. 591.) We are not persuaded by defendant's argument that it would have been futile to object to the admission of Sergeant Watkins's testimony. However, we review the claim because defendant contends counsel provided constitutionally ineffective assistance. (See, e.g., *Neely, supra*, 176 Cal.App.4th at p. 795.)

Sergeant Watkins's testimony on direct examination did not express a conclusive opinion as to guilt. He described the incident and the conclusions he drew at the time, which ultimately caused him to arrest defendant. He stated that only at a certain point he believed defendant was a look out and "possibly a pimp." Defense counsel attempted to take advantage of the sergeant's equivocal statement on cross-examination, and elicited much more detailed information. This questioning permitted the prosecutor to clarify Sergeant Watkins's opinion on redirect examination. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 643-644 [cross-examination by the defendant may open the door for admission of evidence on redirect examination that is favorable to the prosecution and which may not have been admissible in the prosecution's case-in-chief].)

We are further satisfied that error, if any, was harmless. (*Leonard, supra*, 228 Cal.App.4th at p. 493 [assuming officer's testimony that defendant acted as a pimp could be construed as an impermissible opinion on guilt, the error was nonprejudicial].) The jury was properly instructed on its role as the exclusive judges of credibility (CALCRIM No. 226) and that jurors were not bound by an expert's opinion, but could afford the opinion the weight it deserved (CALCRIM No. 332). Without consideration of Sergeant Watkins's opinion, the remaining evidence against defendant was overwhelming. Defendant admitted to placing ads on Backpage, an online hub for prostitution. He was observed entering the parking lot at the same time as Douglas, speaking with her before she went inside the hotel, and surveying the parking lot. Douglas gave defendant her purse for safekeeping. Hotel records showed that defendant rented the room in which Douglas met the undercover officer who she believed was a client, and that defendant had rented rooms in the hotel on six other occasions. After agreeing to exchange sexual intercourse and lewd acts for money with an undercover officer, Douglas admitted that

24

she was a prostitute and that defendant was her pimp. She testified that he showed her how to engage in sexual intercourse and lewd acts in a way that would be pleasing to her clients. Douglas identified defendant in a field lineup prior to his arrest.

Because defendant has not established prejudice, his ineffective assistance of counsel claim necessarily fails. (See *People v. Dennis*, *supra*, 17 Cal.4th at pp. 540-541 [defendant claiming ineffective assistance of counsel must establish prejudice].)

## *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by asking Douglas whether Officer Quiroga's testimony was untrue because it conflicted with her testimony. Defendant has forfeited the claim by failing to object on the ground of misconduct below, and it fails on the merits regardless, because it is unlikely that the result would have been more favorable to him if the claimed misconduct had not occurred.

### **Proceedings**

On direct examination the prosecutor questioned Douglas about the incident:

"[Prosecutor]: And so at some point did you—were you supposed to meet with [Officer Quiroga]?

"[Douglas]: Yes.

"[Prosecutor]: How did you find out about that?

"[Douglas]: I believe [defendant] had gotten an e-mail, I don't know, I can't remember if it was an e-mail or text, but he got a call.

"[Prosecutor]: And at some point did you receive a call?

"[Douglas]: No. Not that I remember, no. It was just directed to me."

On redirect examination the prosecutor questioned Douglas further:

"[Prosecutor]: If you heard that the officer who ended up being the undercover officer, if he said that he spoke to you on the phone that day, would you think that he was lying, or would you think that you don't remember, or—

"[Defense Counsel]: Objection. Relevance.

"[Court]: To be honest with you, I didn't understand the question. What was your question?

"[Prosecutor]: If you had—if you were told that the officer—

"[Douglas]: That I had spoke [sic] to him prior.

"[Prosecutor]: Yes.

"[Court]: I don't want your input. I want to know your question directed to me.

"[Prosecutor]: If she was told that the officer said that he received a phone call from her prior to meeting in the undercover capacity in that motel room would she think that he was lying about that.

"[Court]: The objection is overruled. [¶] You understood the question. [¶] You may answer.

"[Douglas]: No. I don't think he would be lying. It probably happened. I really don't remember.

"[Defense counsel]: Objection. Speculation. Motion to strike.

"[Court]: Sustained. Stricken.

"[Prosecutor]: Is it fair to say you don't remember every detail of how everybody got to the rooms, ever?

"[Douglas]: No. Sometimes I would talk to them before.

"[Prosecutor]: But it is fair to say you don't remember every detail of every different incident of each guy?

"[Douglas]: Right."

Later, when the prosecutor asked Officer Quiroga about how he and Douglas arranged to meet, he said that he called a number on an ad and a woman answered. He subsequently testified that it was Douglas who had spoken to him.

26

**Law**

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. [Citation.]' [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "A defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably probable that the jury would have reached a result more favorable to the defendant had the misconduct not occurred." (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 243.)

Case law is split as to whether asking "were they lying" questions is categorically proper or misconduct, or instead whether the propriety of such questions is dependent on the circumstances. (*People v. Foster* (2003) 111 Cal.App.4th 379, 384; *People v. Hawthorne* (2009) 46 Cal.4th 67, 97-98, abrogated on another ground by *People v. McKinnon* (2011) 52 Cal.4th 610.) Our Supreme Court addressed the question in *People v. Chatman* (2006) 38 Cal.4th 344, 382, and followed the line of cases that examines the context in which "were they lying" questions were raised to determine their propriety. Such queries are legitimate if they call for testimony that would properly help the jury to determine credibility. (*Id*. at p. 383.) A witness may properly be asked a "were they lying" question to clarify their own position. (*Ibid*.) "Were they lying" queries are improper if they are merely argumentative or call for "irrelevant or speculative" testimony. (*Id*. at p. 384.)

**Discussion**

Defense counsel objected to the prosecutor's question on the bases of relevance and speculation. She did not object on the basis that the questioning rose to the level of misconduct, nor did she request an admonition. The issue was not preserved for review. (See *People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.)

Even if the issue had been preserved, in light of the context, we do not believe the prosecutor's questions to Douglas were improper. Officer Quiroga had not yet testified, but the prosecutor anticipated he would state that Douglas was the person he contacted, rather than defendant. When Douglas brought the issue into question, the prosecutor sought to determine if there was an explanation for the potentially conflicting testimony. In fact, there was. Douglas had had numerous clients—some who contacted her through defendant and others who spoke with her directly. She could not remember for certain whether she or defendant spoke with Officer Quiroga to set up their meeting. Because of her faulty memory, Douglas believed that the officer would be testifying truthfully if he said he spoke with her. If it had not been stricken, this testimony would have shed light on the veracity of both Douglas and the officer.

We further hold that it is not reasonably probable that the jury would have reached a different verdict if the prosecutor had not asked Douglas the question. Douglas's answer was stricken on another ground, and the jury was instructed to disregard stricken testimony under CALCRIM No. 222. Additionally, as we have discussed, the evidence at trial was overwhelmingly against defendant. There is no basis to reverse the judgment.

*Sentencing Error*

We agree with the parties that the trial court's imposition of a one-year prison term pursuant to section 667.5, subdivision (b), was in error. The enhancement was never alleged as required by section 667.5, subdivision (d). (*People v. Tenner* (1993) 6 Cal.4th 559, 562 [enhancements "shall not be imposed unless they are charged and admitted or

28

found true in the action for the new offense"].)  The enhancement was not proven or admitted.  The enhancement must be stricken.

## DISPOSITION

The judgment is modified to strike the one-year enhancement pursuant to section 667.5, subdivision (b).  The trial court is directed to prepare an amended abstract of judgment reflecting this modification and forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


KRIEGLER, Acting P. J.

We concur:


BAKER, J.


KUMAR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.